UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
KAREN MOULDING,                          :
                                         :            08 Civ. 9824 (HB)
                      Plaintiff,         :
                                         :            **OPINION & ORDER**
       -against-                         :
                                         :
MICHAEL J. ASTRUE,                       :
Commissioner of Social Security,         :
                                         :
                      Defendant.         :
------------------------------------------------------------x
**Hon. Harold Baer, Jr., District Judge**[*]**:**

     Karen Moulding ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) to challenge the final determination by the Commissioner of Social Security (the "Commissioner") that she was not disabled within the meaning of the Social Security Act beginning December 30, 2001, and hence not eligible for disability insurance benefits ("DIB") or Supplemental Security Income ("SSI"). Both the Commissioner and Plaintiff move for judgment on the pleadings. For the following reasons, the Commissioner's motion is denied and the case is remanded for further proceedings consistent with this opinion.

### I. BACKGROUND

**A.    PROCEDURAL HISTORY**

     Plaintiff applied for DIB and SSI on March 21, 2002 for the period beginning December 30, 2001, alleging she was unable to work due to chronic Lyme disease. Her application was denied; Plaintiff then requested an administrative hearing before an administrative law judge ("ALJ"), which was held on October 20, 2003. The ALJ, by decision dated January 26, 2004, found Plaintiff not disabled. Plaintiff requested review, and the Appeals Council, by order dated October 31, 2005, vacated the ALJ's decision and remanded for further proceedings. A second hearing before the ALJ was held on May 22, 2006.[1] The ALJ again found Plaintiff not disabled by decision dated September 18, 2006. Plaintiff then commenced this action by filing a complaint on November 13, 2008.

---

[*] Mark McDonald, a Summer 2009 intern in my Chambers and a second-year law student at New York University School of Law, provided substantial assistance in the research and drafting of this opinion.

[1] Plaintiff was represented by counsel at both administrative hearings. *See* Tr. 460, 475.

B.     NON-MEDICAL EVIDENCE IN THE RECORD

Plaintiff, born in 1962, has a law degree and two other post-graduate degrees. Transcript of Administrative Record of the Social Security Administration ("Tr.") 152, 464, 477, 479. Prior to December 2001, Plaintiff worked as a lawyer, adjunct college instructor, editor and writer. Tr. 147, 152, 157, 166, 462-63, 477. The record reveals that Plaintiff has never earned more than $25,112 in a single year and earned only $684 in 1993. Tr. 138. In the ten years prior to her alleged onset of disability in December 2001, Plaintiff's median annual income was $9,132. *See id.* After her alleged onset, Plaintiff worked part-time as an adjunct college English instructor and as an editor, earning $10,457 in 2002; $8,912 in 2003; $9,285 in 2004; and $3,510 in 2005. Tr. 138, 478.

It appears that Plaintiff was bitten by a tick while visiting the Hamptons in 1995. Tr. 465. Plaintiff noticed a sign indicating ticks were endemic in that area; after some time, Plaintiff developed the bulls-eye rash characteristic of tick-borne Lyme disease. Tr. 329. However, Plaintiff was not tested or treated for that illness until six months later. Tr. 466. Like approximately five percent of Lyme disease victims, Plaintiff's condition had by then become "chronic." *See* Tr. 427. The ALJ agreed that Plaintiff has had chronic Lyme disease throughout the period for which she claims disability.[2] Tr. 18.

Plaintiff complains of various symptoms that flare up cyclically and unpredictably. Tr. 173. While she may be "symptom free" one week (Tr. 76), a "flare up" of such symptoms might render her unable to work the next, making her an unreliable employee. Tr. 479. These symptoms include inflammation in her neck, back, arms, wrists and hands, numbness in her fingers, stabbing nerve pains, sore knees, vertigo, insomnia, forgetfulness, "spelling and writing errors," and recurrent low grade fever. Tr. 60, 484-85. When her neck is inflamed, Plaintiff claims she cannot sit or lift anything; on some days, Plaintiff claims she cannot stand or walk for more than ten minutes without discomfort.[3] Tr. 60. Because of frequent nerve pains in her wrists and hands, Plaintiff claims that there are days when she cannot type or write for more than a few minutes. *Id.* As a side effect of the antibiotics Plaintiff takes, she periodically suffers diarrhea. Tr. 61. Plaintiff does not allege a mental impairment and denies being clinically depressed. Tr. 19-20.

---

[2] Though Plaintiff alleges that she contracted Lyme disease in 1995, she only alleges disability for the period beginning December 30, 2001.

[3] However, Plaintiff testified at the second administrative hearing that she could stand for a few hours. Tr. 486.

2

Plaintiff lives alone, and sometimes socializes with friends. Tr. 479, 483. Plaintiff describes her daily activity as follows: "Wake often late (insomnia, exhaustion). Make breakfast so can take medication. Write at home if feel able, or else read. Shower/dress if shopping necessary. Cook if able or order in dinner." Tr. 158. She also performs light cleaning and ironing, goes outside approximately once every two days, and goes food shopping once a week if able. Tr. 160-61.

C.   MEDICAL EVIDENCE IN THE RECORD

The record in this case contains voluminous medical evidence; however, here I will refer only to those medical opinions that are relevant to this appeal. I include both "treating source" and "non-treating source" opinions as those terms are defined by the Commissioner's regulations. *See* 20 C.F.R. §§ 404.1502, 416.902. Specifically, the discussion below will address the medical opinions that the ALJ expressly considered and relied upon in making his determination, as well as the sources to which Plaintiff now refers in arguing that the ALJ's decision was in error.

1.   Treating Sources

a.   Dr. Stanley Dziedzic

Dr. Stanley Dziedzic appears to have been Plaintiff's primary physician from 1995 to 2000. *See* Tr. 218, 305-06. The only evidence in the record from Dr. Dziedzic is a letter dated July 31, 2000 addressed "To Whom it May Concern." Tr. 305-06. The letter describes Plaintiff's medical history beginning in 1995. Tr. 305.

Dr. Dziedzic diagnosed Plaintiff with Lyme disease and prescribed Plaintiff a number of antibiotics in 1996 and 1997 with some improvement in her symptoms, but with some side effects including diarrhea. Tr. 305-06. He opined that the therapy had succeeded in partially eradicating the disease or at least in suppressing it periodically, but that "this unfortunate individual has continued to experience symptoms despite aggressive antibiotic therapy." Tr. 306. Such symptoms were intermittent and included fatigue, dizziness, stiff neck, sleep disturbances and tinnitus (ringing in ear). *Id.* The ALJ afforded Dr. Dziedzic's opinion limited weight because it was written more than a year before Plaintiff's alleged onset date. *Id.*

b.   Dr. Kenneth B. Liegner

Dr. Kenneth Liegner, an internist and expert in tick-borne diseases (including Lyme disease), examined Plaintiff on several occasions between June 1999 and September 2003. Tr. 24, 458, 466. The record contains, *inter alia*, the following evidence from Dr. Liegner: (1) two

3

detailed consultation reports, one dated June 2, 1999 (Tr. 210) and the second dated December 4, 2001 (Tr. 219); and (2) two letters addressed "To Whom It May Concern," one dated October 17, 2003 (Tr. 286) and the other dated November 28, 2006 (Tr. 458).[4]

At their first meeting on June 2, 1999, Plaintiff complained of several symptoms including "[c]ognitive difficulties," insomnia, stiff neck and back, sore wrists, knees and forearm, vertigo, stabbing pain, muscle twitching, numbness, and low grade fever. Tr. 210. Plaintiff was in no acute distress but was concerned about her condition. Tr. 212. On examination, Plaintiff's neck was supple, but she complained of discomfort when attempting flexion. *Id.* Dr. Liegner also noted "definite" tenderness of the temporomandibular joint and bilateral occipital insertion. *Id.* Plaintiff's higher mental functioning was grossly intact and her affect was appropriate. *Id.* Dr. Liegner's impression was that Plaintiff had Lyme disease, carpal tunnel syndrome seemingly related to Plaintiff's Lyme disease, and some cognitive problems. Tr. 214. He recommended additional testing, including a brain single photon emission computed tomographic ("SPECT") scan. *Id.*

Dr. Liegner next examined Plaintiff on December 4, 2001. Tr. 219. He noted again that Plaintiff was in no acute distress. Tr. 220. Her chief complaints were forgetfulness, headaches, slight stiff neck, some left knee discomfort, left eye pain, muscle twitching, numbness, some balance difficulties, insomnia, tinnitus, some photosensitivity, temperature elevation, and slight vertigo. Tr. 219. Dr. Liegner noted Plaintiff complained of pretibial tenderness bilaterally but had no definite joint inflammation or complaints of tenderness with joint compression. Tr. 221. A Romberg test was negative and her gait was normal. *Id.* Plaintiff again exhibited tandem ataxia with her eyes closed (but not with her eyes open). *Id.* Her affect was appropriate and her higher mental functioning appeared intact. *Id.* Dr. Liegner concluded that Lyme disease was the correct diagnosis and that Plaintiff was doing reasonably well, though she had been exhibiting a monthly cluster of symptoms, including low grade fever, temporally coinciding with her menstrual cycle. Tr. 222.

On October 17, 2003, Dr. Liegner signed a letter addressed "To Whom it May Concern" in which he wrote that Plaintiff had "chronic active late stage neurological Lyme disease," which

---

[4] The November 28, 2006 letter post-dated the ALJ's decision and thus was never considered by the ALJ. However, because this letter was submitted before the Appeals Council denied review, it is part of the record on this appeal. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) ("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the [Commissioner].").

4

diagnosis is "well-documented." Tr. 286. The letter stated that "[a]s is often the case with late stage Lyme disease, Ms. Moulding's symptoms are cyclic and unpredictable. The patient may seem almost fine on a given day, only to relapse severely shortly thereafter." *Id.* Dr. Liegner described neck, back, arm and hand pain, which was often severe enough that Plaintiff could neither sit nor write without severe pain. *Id.* The letter then listed additional symptoms: "insomnia, mental confusion, tinnitus, stabbing nerve pains in her legs, neuropathy, vertigo and balance difficulties and skin rashes." *Id.* Finally, the letter noted that it was highly improbable that these symptoms would abate in the foreseeable future. *Id.*

The ALJ afforded persuasive weight to Dr. Liegner's 1999 and 2001 reports describing consultations with Plaintiff in detail, but only "very limited weight" to the 2003 letter, in part because the latter was not supported by objective medical evidence and was contradicted by other evidence in the record. Tr. 25.[5]

### c. Dr. Marilyn Jackson

Dr. Marilyn Jackson was Plaintiff's primary care physician beginning in 2003. Tr. 76. The record contains a letter signed by Dr. Jackson dated March 31, 2006 addressed "To Whom it May Concern." *Id.* The letter noted that Plaintiff "suffers from the symptoms of late stage Lyme disease." *Id.* Dr. Jackson then listed the symptoms "of which [Plaintiff] has complained, and which I have observed on clinical exam" including stiff neck "sometimes to the point of immobility," sore wrists resulting from inflammation of the median nerve, stabbing nerve pains in her thigh, low grade fever, exhaustion resulting from insomnia "with tinnitus," vertigo confirmed by a positive Romberg exam, and osteoarthritis in the knees confirmed by MRI as well as a more recent clinical exam. *Id.* Dr. Jackson concluded that Plaintiff's Lyme disease symptoms affected her ability to function in a predictable manner. *Id.* The ALJ gave Dr. Jackson's letter limited weight, in part because it was not supported by objective medical evidence and was contradicted by other evidence in the record. Tr. 23.

---

[5] Without having reviewed Dr. Liegner's November 28, 2006 letter, in which Dr. Liegner asserted that he would not have signed the October 17, 2003 letter "unless, after carefully reviewing it, [he] was in full agreement with its contents," (Tr. 458), the ALJ noted that the October 17, 2003 letter was very similar to one contained in an October 10, 2003 email from Plaintiff to her attorney, in which Plaintiff wrote "Here's what I think my dr. would be comfortable saying. . . . Let me know asap if it's good, or any suggested changes, so I can fax it to him by 3 today, if possible." Tr. 287. The ALJ found that this similarity made it "difficult at best to extrapolate Dr. Liegner's opinions and/or emphasis from those of the claimant." Tr. 25. He noted that it cast doubt on all "To Whom it May Concern" letters in the record. *Id.*

5

### 2. Non-Treating Sources

#### a. Dr. Jose Rabelo

Dr. Jose Rabelo, a State Agency physician (Tr. 24), prepared a one-page report for the Social Security Administration, dated October 27, 2003. Tr. 291. Dr. Rabelo reviewed the medical evidence and an August 18, 2002 neurological examination of Plaintiff. *Id.* This exam revealed a negative Romberg test and no finding of ataxia; there was no evidence of a neurological impairment secondary to Lyme disease. *Id.* Dr. Rabelo noted the results of a brain SPECT scan and MRI, the results of which he considered "borderline normal."[6] *Id.* He noted that "the possibility of Lyme disease is not discarded," but that there was no physical or laboratory exam to demonstrate Plaintiff had severe symptoms that resulted from Lyme disease. *Id.* He noted that the treating physician recommended that Plaintiff could stand and walk for no more than two hours, though this was based mainly on "somatic complaints" and not supported by any physical exam findings. *Id.* Dr. Rabelo concluded that Plaintiff was limited to lifting and carrying twenty pounds, and could stand or walk for up to six hours, with occasional postural limitations. *Id.* The ALJ rejected Dr. Rabelo's "ambivalence" toward the Lyme disease diagnosis but gave Dr. Rabelo's functional analysis, "whatever the ultimate diagnosis," persuasive weight because it was supported by and consistent with other evidence in the record. *Id.*

#### b. Dr. Charles M. Plotz

Dr. Charles Plotz, an internist specializing in rheumatology (Tr. 414-16), was requested by the ALJ to give expert testimony at the hearing. Tr. 67. The ALJ stated at the hearing that Dr. Plotz was not an employee of the federal government, but that he was on a panel of experts "that we call in from time to time when we feel like we need some clarification of a medical diagnosis that would help me make a decision." Tr. 477. Dr. Plotz testified that he had treated patients with chronic Lyme disease in the past.[7] Tr. 491.

At the hearing, Dr. Plotz testified that he had reviewed Plaintiff's medical evidence and had been present when Plaintiff testified earlier at the hearing. Tr. 487. Dr. Plotz noted that Plaintiff had the antibody for borrelia burgdorferi, the organism that causes Lyme disease. Tr.

---

[6] Plaintiff had a brain SPECT scan in February 2002, the results of which were described as "Very mild / Borderline normal, global, cortical hypoperfusion with heterogeneity." Tr. 248. Plaintiff had an MRI on her right knee in August 2004 which revealed no acute bone pathology, no frank meniscal tear and "mild patellofemoral osteoarthritis." Tr. 407.

[7] On this appeal, Plaintiff disputes Dr. Plotz's knowledge of the common symptoms of chronic Lyme disease. Pl.'s Mem 14.

6

488. He also noted that Plaintiff's medical history was notable for a "bunch of symptoms" that he found to be "not very specific." Tr. 489. Dr. Plotz testified that there was no objective evidence for the "acute flares" described by Plaintiff. Tr. 496. He noted that multiple neurological examinations, including Romberg tests, were essentially negative.[8] Tr. 489. Dr. Plotz noted that the only objective evidence was "a little bit of osteoarthritis of her knee, but not much." *Id.* Dr. Plotz concluded that Plaintiff's condition did not meet the criteria in the Commissioner's Listing of Impairments and that she could perform a full range of physical activity. Tr. 490. Despite noting Plaintiff's positive tests for Lyme disease, Dr. Plotz opined that Plaintiff did not have chronic Lyme disease, or at least that her symptoms were not related to Lyme disease.[9] Tr. 489.

The record contains two letters from Plaintiff's counsel sent to the ALJ shortly after the hearing that attack the validity of Dr. Plotz's expert testimony. Tr. 418-21, 424-47. The chief argument presented by these letters and their attachments is that Dr. Plotz misstated the typical symptoms of chronic Lyme disease, which in fact correspond to those complained of by Plaintiff, and that therefore his testimony should be stricken. Tr. 424-25.

The ALJ's decision does not characterize Dr. Plotz's testimony as rejecting a diagnosis of Lyme disease. *See* Tr. 24. Rather, according to the ALJ, Dr. Plotz testified that Plaintiff's illness "sounded like Lyme disease," and that Plaintiff's osteoarthritis, though mild, was a valid symptom of that impairment. *Id.* The ALJ interpreted Dr. Plotz's testimony as opining that, objectively, Plaintiff could perform a full range of physical activity, but "since this case is based on subjective complaints, or a series of symptoms, what the claimant could actually perform is subject to interpretation." *Id.* The ALJ afforded Dr. Plotz's opinion average weight. *Id.*

**D.     THE ALJ'S DECISION**

Applying the analysis set forth in the Commissioner's regulations, the ALJ conceded that Plaintiff was not currently engaging in substantial gainful activity,[10] had a severe impairment

---

[8] Dr. Jackson's March 31, 2006 letter reports a positive Romberg exam. Tr. 76. However, with the exception of one positive Romberg test reflected in Dr. Jackson's treating notes (Tr. 89), the record reflects only negative Romberg tests. *See* Tr. 213, 221, 256, 291.

[9] Dr. Plotz stated: "I discussed the symptoms that she had with the man who first discovered Lyme Disease and who knows more about it than anyone in the world, and he agrees with me that she does not have chronic Lyme Disease or has current symptoms, are not related to Lyme Disease." Tr. 489.

[10] However, the ALJ noted that Plaintiff's earnings in 2002, the year following her alleged onset date, met the threshold for substantial gainful activity. Tr. 18. In addition, he noted that her earnings in 2003 and 2004 were very close to the threshold amount, but that her earnings in 2005 did not meet the threshold. *Id.* Though "for the purposes of [his] decision" the ALJ found that Plaintiff was not engaging in substantial gainful activity, he noted that Plaintiff's

7

(though not one that conclusively required a determination of disability), and that she was unable to perform any of her past jobs due to their high levels of stress. However, despite finding that Plaintiff's medically determinable impairment (chronic Lyme disease) could reasonably be expected to produce the alleged symptoms, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of such symptoms "not entirely credible." Tr. 22. Moreover, considering the relative credibility of the various medical opinions, and the fact that Plaintiff's earnings in years 2002 through 2004 either met or were extremely close to the threshold set by the Commissioner to establish a presumption of ability to work, the ALJ found that Plaintiff could "perform substantially a full range of sedentary work at simple tasks." Tr. 27. Accordingly, the ALJ found that Plaintiff could perform work existing in the national economy, and thus determined that she was not disabled.

## II. DISCUSSION

### A.   STANDARD OF REVIEW

The Social Security Act (the "Act") provides that disability claimants may seek judicial review of an adverse decision by the Commissioner. 42 U.S.C. § 405(g). This Court must affirm the Commissioner's determination that a claimant is not disabled unless "the factual findings are not supported by 'substantial evidence' or . . . the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g))).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Such evidence includes inferences and conclusions to be drawn from the evidentiary facts. *Cruz v. Astrue*, No. 08 Civ. 5588, 2009 WL 1835632, at *2 (S.D.N.Y. June 24, 2009). However, this Court will not weigh evidence *de novo*; if there is substantial evidence on both sides, this Court must affirm the Commissioner's decision. *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (affirming Commissioner's decision where substantial evidence existed on both sides); *Flores v. Astrue*, No. 08 Civ. 2810, 2009 WL 1562854, at *9 (S.D.N.Y. May 27, 2009). This

---

earnings in the three years following her alleged onset were "relevant in determining the issue of credibility and the capability of the claimant to perform substantial gainful activity." *Id.*

8

Court may not properly affirm on grounds different from those considered by the Commissioner. *Burgess*, 537 F.3d at 128; *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

The same deferential standard of review does not apply to the legal standards upon which the Commissioner based his decision. *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003). Instead, "[w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted).

**B.     LEGAL STANDARDS FOR DISABILITY CLAIMS**

    **1.     "Disability" Defined; How Determined**

The Act defines disability as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). "Substantial gainful activity" means work that involves "doing significant physical or mental duties" for pay or profit, *Wazeter v. Comm'r of Social Sec.*, No. 08 Civ. 479, 2009 WL 2032076, at *4 (S.D.N.Y. July 6, 2009), and may include part-time work. 20 C.F.R. §§ 404.1572, 416.972. Generally, if the claimant's earnings from employment exceed a certain threshold amount specified in the Commissioner's regulations, it is presumed that she has demonstrated the capacity to engage in substantial gainful activity. 20 C.F.R. §§ 404.1575, 416.974. If the claimant is found to be engaged in substantial gainful activity, she is not disabled under the meaning of the Act, regardless of how severe her impairment and resulting symptoms might be. *Id.*; *see Wazeter*, 2009 WL 2032076 at *4.

The Commissioner has promulgated a five-step analysis to determine whether a claimant is disabled under the meaning of the Act. "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (citation omitted) (brackets in original); *see* 20 C.F.R §§ 404.1520, 416.920.

The inquiries at Steps 4 and 5 follow from the Commissioner's determination of the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v),

416.920(a)(4)(iv)-(v). A claimant's RFC is the most, not the least, that she can do despite her limitations on a regular and continuing basis, meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (S.S.A.). If there is no significant non-exertional impairment, the Commissioner's burden is satisfied at the fifth step by resorting to the medical vocational guidelines (the "Grids") found at 20 C.F.R. Part 404, Subpart P, Appendix 2. *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986); *Zabala v. Astrue*, No. 05 Civ. 4483, 2008 WL 136356, at *5 (S.D.N.Y. Jan. 14, 2008). In the five-step analysis, the claimant bears the burden of proof at the first four steps; the Commissioner bears the burden at the fifth step.[11] *Green-Younger*, 335 F.3d at 106.

A claimant's allegations of pain shall not alone be conclusive evidence of disability.[12] 42 U.S.C. § 423(d)(5)(A); *Betances v. Comm'r of Soc. Sec.*, 206 Fed. App'x 25, 26 (2d Cir. 2006). First, there must be a finding of an impairment supported by "medically acceptable clinical or laboratory diagnostic techniques." 42 U.S.C. § 423(d)(5)(A). For purposes of the Act, an impairment is a result of "anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). Second, the impairment must be such that could reasonably be expected to produce the pain or other alleged symptoms. *Id.* § 423(d)(5)(A).

If such an impairment is found, the Commissioner must then evaluate the intensity and persistence of the resulting symptoms to determine how they affect the claimant's capacity to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). Because symptoms, such as pain, are subjective and difficult to quantify, the Commissioner may consider any statements in the record, whether made by the claimant, treating or consulting sources, or others that pertain to the effect of

---

[11] Previously, the rule in the Second Circuit was that, though the claimant had the burden of proof as to her residual functional capacity ("RFC") at Step 4, the burden would shift to the Commissioner at Step 5 such that the claimant's RFC was determined again *de novo* with the Commissioner now bearing the burden of proof. *Curry v. Apfel*, 209 F.3d 117, 122-23 (2d Cir. 2000). However, the Second Circuit has recently recognized that the Commissioner's new regulations, effective as of August 26, 2003, codified at 20 C.F.R. § 404.1560(c)(2), abrogate *Curry v. Apfel* to the extent that there is now only a limited burden shift at Step 5. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). That is, the Commissioner's RFC determination (with the claimant bearing the burden of proof) controls both Steps 4 and 5. *Id.* The burden merely shifts to the Commissioner at Step 5 to show, based on that RFC determination, that there is work existing in the national economy which Plaintiff can do; the ALJ need not provide additional evidence of the claimant's RFC. *Id.* (citing 20 C.F.R. § 404.1560(c)(2)). The Second Circuit expressly declined to reach the issue of whether this new regulation applies retroactively. *Id.* This issue is relevant here because Plaintiff's alleged onset predates the new regulation. I need not reach the issue here because, as discussed below, I find that no matter what the burden of proof, there is substantial evidence to support the ALJ's determination of Plaintiff's RFC.

[12] However, a lack of an objective explanation for a claimant's pain need not defeat a disability claim. "Under appropriate circumstances, the subjective experience of pain can support a finding of disability." *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999).

such symptoms on the claimant's RFC.  *Id.* §§ 404.1529(c)(3), 416.929(c)(3).  The Commissioner will also consider whether there are any inconsistencies in the evidence, including the extent to which there are any conflicts between the claimant's statements and other evidence in the record. *Id.* §§ 404.1529(c)(4), 416.929(c)(4).  Because symptoms, such as pain, will be determined to diminish the claimant's RFC only to the extent that the alleged symptoms "can reasonably be accepted as consistent with the objective medical evidence *and other evidence," id.* (emphasis added), the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence.

      **2.**      **Treating Physician Rule**

Under the Commissioner's regulations, the medical opinion of a treating source "on the issue(s) of the nature and severity of [the] impairment" will be given controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (emphasis added); see *Burgess*, 537 F.3d at 128.  Generally, the opinions of treating physicians will be given more weight "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Genier v. Astrue*, 298 Fed. App'x 105, 108 (2d Cir. 2008). Where the Commissioner declines to give controlling weight to a treating source opinion, the Commissioner must still weigh the treating source opinion against other evidence by considering (1) the length, frequency, nature and extent of the treating relationship, (2) the supportability of the treating source opinion, (3) the consistency of the opinion with the rest of the record, (4) the specialization of the treating physician and (5) any other relevant factors.  20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6); *see Michels v. Astrue*, 297 Fed. App'x 74, 75 (2d Cir. 2008).

The ALJ must give good reasons for the weight he gives the treating source opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," *Green-Younger*, 335 F.3d at 106 (citation omitted), because the ultimate determination of disability is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  The source of a medical opinion on the questions of

11

disability and RFC will not be given any "special significance." *Id.* §§ 404.1527(e)(3), 416.927(e)(3).

**C.     ANALYSIS**

   **1.     The ALJ Properly Applied the Treating Physician Rule**

Plaintiff first argues that the ALJ erroneously ignored the "treating physician rule." Specifically, Plaintiff claims that the ALJ erred (i) in "ignoring" Dr. Dziedzic's opinion, (ii) by "rejecting" the opinions of Drs. Jackson and Liegner, and (iii) by "relying on" the opinions of non-examining sources Drs. Rabelo and Plotz.

      **a.     Dr. Dziedzic**

Contrary to Plaintiff's assertion, the ALJ did not ignore Dr. Dziedzic's opinion, but discussed it in relative detail. *See* Tr. 22-23. I agree that Dr. Dziedzic was Plaintiff's treating physician for some time between 1995 and 2000; however, the latest evidence contained in the record from Dr. Dziedzic is his letter dated July 31, 2000—more than a year before Plaintiff's alleged onset. This letter could be relevant to the *nature* of the impairment, were that at issue; that is, it could show Plaintiff had chronic Lyme disease in 2000, which would tend to support her claim that she had chronic Lyme disease after her alleged onset date of December 30, 2001. But Plaintiff does not explain how this letter can describe the *severity* of Plaintiff's impairment more than a year later. If it is Plaintiff's contention that her symptoms and RFC went unchanged from July 2000 through the onset of her disability, thus establishing the letter's relevance, I must consider that in the intervening time Plaintiff was able to earn $14,355 in 2001 (Tr. 138), well above the threshold set by the Commissioner's regulations establishing a presumption of ability to engage in substantial gainful activity. *See* 20 C.F.R. §§ 404.1574, 416.974. Plaintiff's ability to work through such symptoms in 2001 would tend to prove her ability to do so in subsequent years. Evidence is material to the outcome of a disability determination only if it "is relevant to the claimant's condition during the time period for which the benefits were denied." *Parajon v. Astrue*, No. 08 Civ. 4815, 2009 WL 1834325, at *7 (S.D.N.Y. June 24, 2009). Dr. Dziedzic's opinion bears no relevance to the severity of Plaintiff's impairment during the relevant time period. Accordingly, I cannot say that the ALJ erred by giving the July 31, 2000 letter limited weight.

### b. Drs. Liegner and Jackson

Though the ALJ gave two consultative reports from Dr. Liegner persuasive weight, he gave only "very limited weight" to Dr. Liegner's October 17, 2003 letter. Tr. 25. Dr. Jackson's March 31, 2006 letter also was given only limited weight. Tr. 23. Plaintiff argues that because these two physicians are "treating sources," the ALJ erred by not giving their opinions, as reflected in their respective letters, controlling weight, or at least more weight than the non-treating source opinions of Drs. Rabelo and Plotz. Because the letters—as well as the issues they raise[13]—are similar, I consider them together.

There is substantial evidence to support the ALJ's finding that the opinions in the two letters (essentially, that Plaintiff was at times unable to function) are inconsistent with the fact that Plaintiff's earnings after her alleged onset date met the threshold for substantial gainful activity. As this is a conclusion drawn from facts, it is subject only to substantial evidence review. *Cruz*, 2009 WL 1835632 at *2. Though the ALJ did not specifically contrast Plaintiff's earnings with Dr. Liegner's and Dr. Jackson's opinions, he did note that Plaintiff's earnings cast doubt on the alleged severity of her symptoms. Tr. 18, 25-26. Clearly the ALJ considered this inconsistency in evaluating the weight to be given to all the source opinions on the question of the severity of Plaintiff's symptoms. Tr. 25-26. As a treating source opinion is not entitled to controlling weight if it is inconsistent with substantial evidence, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), the ALJ was not required to give these opinions controlling weight.

The ALJ also found that these two letters are vague and general, and do not contain an independent *evaluation* of the severity of Plaintiff's impairment as it affects her ability to work, as distinguished from a recitation of Plaintiff's complaints about the severity of her impairment. *Compare Curry*, 209 F.3d at 123 (referring to physician's opinion as "so vague as to render it useless in evaluating whether Curry can perform sedentary work"). A medical opinion necessarily reflects a judgment by the treating or consulting physician. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Here there is substantial evidence to support the ALJ's conclusion that neither letter contains any such judgment regarding the severity of Plaintiff's symptoms. A plausible reading of both letters is that these two physicians simply accepted Plaintiff's statements without

---

[13] In his decision, without the benefit of Dr. Liegner's 2006 letter, the ALJ emphasized the fact that Plaintiff appears to have drafted Dr. Liegner's October 17, 2003 letter; the ALJ found that this fact called into question the validity of the opinion reflected in the 2003 letter. Tr. 25. I need not address whether this analysis was proper, or to what extent it is called into question by Dr. Liegner's 2006 letter, because I find that the other reasons given by the ALJ for "rejecting" the opinion reflected in the 2003 letter are based on substantial evidence.

scrutiny. First, neither letter cites substantial objective medical evidence of the severity of Plaintiff's symptoms.[14] Though Dr. Jackson's letter points to a single positive Romberg exam as confirming vertigo, there are numerous negative Romberg tests elsewhere in the record. *See* Tr. 213, 221, 256, 291. Similarly, while Dr. Jackson's letter reports an MRI confirming osteoarthritis, the results were reported to be "mild." Tr. 407. Second, on their face, neither letter purports to offer a specific, evaluative medical opinion on that subject.[15]

Plaintiff argues in her reply that, in any event, the ALJ erred in failing to give good reasons for the weight he gave these opinions. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). While I agree that the ALJ's analysis leaves something to be desired, his reasoning is substantially supported by the evidence in this case.

Another issue with respect to these two letters is whether the ALJ had an obligation to follow up with Dr. Liegner or Dr. Jackson if he found their opinions insufficient. Where the ALJ can decide based on the available evidence whether the claimant is disabled, he does not have an obligation to "try to obtain additional evidence" merely because a treating source opinion is contradicted by other evidence in the record. 20 C.F.R. §§ 404.1527(c), 416.927(c). An obligation to try to obtain additional evidence will arise where there are "clear gaps" in the record. *Burgess*, 537 F.3d at 129. "If the [ALJ] believes that there is *relevant and material* evidence available which has not been presented at the hearing, he *may* adjourn the hearing or, at any time,

---

[14] Because the ALJ agreed that there was sufficient objective evidence to establish that Plaintiff suffered from chronic Lyme disease, a question arises whether the existence of chronic Lyme disease should be considered sufficient proof of the disabling symptoms that are alleged to result from that impairment. *Compare Green-Younger*, 335 F.3d at 1 (noting "a growing number of courts, including our own, . . . have recognized that fibromyalgia is a disabling impairment"). Unlike fibromyalgia, which is an impairment that by definition consists of chronic pain, *id.* at 101 n.1, there appears to be no consensus as to whether chronic Lyme disease leads to disabling symptoms. *See, e.g.*, *Deleonardis v. Astrue*, No. 07 Civ. 50, 2008 U.S. Dist. LEXIS 15580, at *3, 14-15 (W.D. Va. Feb. 22, 2008) (holding substantial evidence supported denial of benefits even though ALJ found that plaintiff had Lyme disease); *Hodges v. Barnhart*, No. 04 Civ. 6008, 399 F. Supp. 2d 845, 858-59, 860 (N.D. Ill. 2005) (same); *but see O'Connell v. Apfel*, No. 97 Civ. 6680, 1999 U.S. Dist. LEXIS 1892, at *15-17 (E.D.N.Y. Feb. 19, 1999) (remanding where ALJ denied benefits despite finding Plaintiff had Lyme disease). Interestingly, unlike Plaintiff here, the majority of Lyme disease claimants allege the existence of some other impairment, including in some cases fibromyalgia. *See, e.g.*, *Stark v. Astrue*, No. 06 Civ. 52, 2007 U.S. Dist. LEXIS 24042, at *31 (W.D. Wisc. Mar. 28, 2007) (rejecting argument that plaintiff's positive Lyme disease test was conclusive evidence of fibromyalgia). Especially in the absence of any precedent holding chronic Lyme disease as per se disabling (i.e., requiring no further evidence as to symptoms), any determination that chronic Lyme disease is a disabling impairment is properly left to the Commissioner. Here, the Commissioner has not listed chronic Lyme disease as a necessarily disabling impairment, *see Hodges*, 399 F. Supp. 2d at 852 (testimony of "SSA medical expert"), and has decided to deny Plaintiff's disability claim on the basis of this record.

[15] That Dr. Liegner has stated in a letter dated November 28, 2006 that he agrees with his first letter's contents is immaterial for present purposes. This second letter does not cure the vagueness of Dr. Liegner's first letter (nor, for that matter, of Dr. Jackson's letter).

prior to the filing of the compensation order, reopen the hearing for the receipt of such evidence." *Id.* at 128 (quoting 20 C.F.R. § 702.338) (emphasis added). Plaintiff does not contend on this appeal that the record before the ALJ was incomplete.[16] This record contained other reports from Drs. Liegner and Jackson, among other sources, including two reports written by Dr. Liegner that the ALJ afforded persuasive weight. Therefore, I cannot say that there were any clear gaps in the record before the ALJ that gave rise to an obligation to try to obtain additional evidence.

                c.       **Dr. Rabelo**

Though the ALJ did not accept all of Dr. Rabelo's opinion, he found that Dr. Rabelo's functional analysis was consistent with the record and, accordingly, he gave that part of the opinion persuasive weight. Tr. 24. Plaintiff first argues that, as a non-treating source, Dr. Rabelo's opinion cannot override the treating source opinions in the record. That would be true if any treating source opinion were entitled to controlling weight; but, for the reasons discussed above, the ALJ properly declined to give controlling weight to any treating source opinion in this record. Because the ALJ acted properly in giving those treating source opinions only limited weight, they are not impervious to contradiction by the opinions of non-treating sources, at least where the latter are more persuasive according to the factors set forth in the regulations. *See* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6). Here, there is substantial evidence that Dr. Rabelo's functional analysis, unlike the opinions of Drs. Liegner and Jackson, was supportable and consistent with the record.

As to reports of pain, by the claimant, while they are to be considered, they are not dispositive. *See Green-Younger*, 335 F.3d at 107. The point is not that, as a matter of law, there is no objective medical evidence of Plaintiff's symptoms, or even that such a lack would be dispositive, but that there is substantial evidence to support the ALJ's finding that Dr. Rabelo's opinion on this point was "supportable." Moreover, unlike the opinions of Drs. Liegner and Jackson, Dr. Rabelo's opinion as to Plaintiff's RFC is consistent with Plaintiff's earnings in the three years following her alleged onset date. For these reasons, the ALJ did not err by giving Dr. Rabelo's functional analysis more weight than the opinions of the treating physicians.

Plaintiff next argues that the ALJ was not permitted to accept Dr. Rabelo's functional analysis after having rejected his opinion that Plaintiff might not actually suffer from chronic

---

[16] Plaintiff does point out that Dr. Liegner's November 28, 2006 letter (confirming his agreement with the October 17, 2003 letter's contents) was not considered by the ALJ. However, for the reasons discussed above, consideration of the issues raised by the November 28, 2006 letter does not affect the outcome of this case.

15

Lyme disease. Plaintiff fails to point this Court to any authority stating such a rule either in the caselaw or in the Commissioner's extensive regulations. On the other hand, there is substantial evidence to support the ALJ's decision in this regard. Accordingly, the ALJ could reasonably have afforded persuasive weight to Dr. Rabelo's functional analysis, as it was based on a supportable and consistent perception of a lack of objective medical evidence.

### d.     Dr. Plotz

Contrary to Plaintiff's contention, the ALJ did not "rely" on Dr. Plotz's opinion, but rather afforded his opinion "average" weight. Tr. 24. The crux of Dr. Plotz's opinion, as interpreted by the ALJ, was that there was limited objective evidence of the severity of Plaintiff's impairment, and that "what the claimant could actually perform is subject to interpretation." *Id.* As discussed above, this contention is both supportable and consistent with the other evidence in the record; thus, the ALJ was not required to reject it.

Plaintiff very reasonably points out that it should not come as a surprise that Dr. Plotz discounted Plaintiff's alleged symptoms when he did not believe that Plaintiff was even sick. But the point remains, as discussed above, that there is little, if any, objective evidence of pain in the record; furthermore, Plaintiff's earnings after her alleged onset is substantial evidence that supports and is consistent with Dr. Plotz's opinion on this medical issue. Thus, it was not improper under the pertinent regulations for the ALJ to give average weight to this opinion. *See* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

### 2.     The ALJ Did Not Err in Evaluating Plaintiff's Credibility

Plaintiff next argues that the ALJ erred in evaluating Plaintiff's allegations of pain. First, Plaintiff argues that where, as here, a claimant presents objective evidence of an impairment that can cause pain, her testimony regarding the extent of that pain is entitled to great weight. The case cited for this proposition, however, states only that where a claim of disabling pain is supported by objective evidence, such testimony is entitled to great weight. *See Nelson*, 882 F.2d at 48. Objective evidence of an *impairment* is not the same as objective evidence of *pain*. *See* 42 U.S.C. § 423(d)(5)(A) (stating that, beyond objective evidence of an impairment, objective medical evidence of pain "must be considered"). The ALJ found that the record in this case contained objective evidence of the former but not the latter, and there is substantial evidence to support this finding.

16

Furthermore, Plaintiff overlooks the Commissioner's regulations that plainly state that even where it is determined that a claimant has an impairment that could reasonably cause the symptoms alleged, the Commissioner must still evaluate allegations of symptoms for, *inter alia*, their supportability and consistency with other evidence in the record.  20 C.F.R. §§ 404.1529(c), 416.929(c).  Here, the ALJ determined that in light of the general lack of objective medical evidence on this issue, and the fact that Plaintiff had engaged in the equivalent of substantial gainful activity after her alleged onset, her allegations as to the severity and persistence of her symptoms were not entirely credible.  The ALJ, who observed Plaintiff at the hearing, is entitled to make such a credibility determination.  *Snell*, 177 F.3d at 135 ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.").  Regardless of whether I might have come to the same conclusion, I find that the ALJ applied the correct standard and that his decision is supported by substantial evidence.

Plaintiff next argues that the ALJ erred in holding Plaintiff's attempts to work against her.  To that extent, Plaintiff misunderstands the applicable standard of review.  This Court is not to reweigh the evidence, but must look only to see whether there is substantial evidence to support the Commissioner's decision.[17]  *DeChirico*, 134 F.3d at 1182.  Plaintiff's earnings in the three years following her alleged onset,[18] and the lack of objective medical evidence substantiating Plaintiff's allegations of pain, both constitute substantial evidence from which the ALJ concluded that Plaintiff's allegations of disabling symptoms were not entirely credible.  Because this is a conclusion based on substantial evidence it cannot be reversed merely because reasonable minds might have reached a different conclusion.

### 3. The ALJ's Finding That Plaintiff Has No Significant Non-Exertional Impairment Is Not Supported By Substantial Evidence

Plaintiff argues that the Commissioner did not sustain his burden at Step 5 because the ALJ resorted to the grids instead of consulting a vocational expert to determine whether there was work

---

[17] On the other hand, Plaintiff points to *Nelson v. Bowen*, in which the Second Circuit noted "When a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he was capable of working."  882 F.2d at 49.  Regardless of whether this was part of the holding of *Nelson*, or of more recent cases containing similar language, there is substantial evidence in this record that "truly showed that [Plaintiff] was capable of working."

[18] Perhaps a different situation would have been presented had Plaintiff's work history shown a precipitous drop in annual earnings after she began to suffer from chronic Lyme disease.  *See Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.").  That is not the case here, however; Plaintiff's earnings in each of the three years following her alleged onset date exceeded or came close to her median annual earnings from the ten years prior to her alleged onset.  *See* Tr. 138.

existing in the national economy that Plaintiff could perform. The grids are insufficient where a claimant's non-exertional impairments "significantly limit the range of work permitted by his exertional limitations." *Bapp*, 802 F.2d at 605. A "significant" limit is "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's range of work as to deprive him of a meaningful employment opportunity." *Id.* at 606. A non-exertional impairment is a limitation that affects the claimant's ability to work other than "strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling." 20 C.F.R. § 404.1569a(a). Non-exertional impairments may include difficulty concentrating and "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling or crouching." *Id.* § 404.1569a(c).

The ALJ found that Plaintiff had no significant non-exertional impairment. Tr. 21. However, the ALJ did not provide an explanation for this conclusion. Not only am I unable to say, therefore, that this conclusion is supported by substantial evidence, it is contradicted by the ALJ's finding at Step 4 that Plaintiff could not perform any of her past jobs because they required "high levels of concentration, attention, memory and toleration of stress." Tr. 26. Thus, the ALJ implicitly found that Plaintiff's non-exertional impairments (affecting her abilities to concentrate, maintain attention, remember, and tolerate stress) significantly limited the range of work Plaintiff could perform. In other words, her non-exertional impairment "so narrow[ed her] range of work as to deprive [her] of a meaningful employment opportunity." Under such circumstances, the ALJ was required to consult a vocational expert to determine whether, given Plaintiff's RFC as determined by the ALJ, including her non-exertional limitations, there is any work that exists in the national economy that Plaintiff can perform. *Bapp*, 802 F.2d at 606.

### III. CONCLUSION

For the foregoing reasons, the ALJ erred by not consulting a vocational expert at Step 5. Therefore, the Commissioner's motion for judgment on the pleadings is denied and the case is remanded for further proceedings consistent with this opinion. The Clerk of the Court is instructed to close these motions (Docket Nos. 10 and 13) and to close this case and remove it from my docket.

SO ORDERED.
October 7, 2009
New York, New York

_____
U.S.D.J.

18